Ryan Costello, IL SB #6317378
Megha Desai, OSB #141441
Assistant Federal Public Defenders
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Emails:  Ryan_Costello@fd.org
        Megha_Desai@fd.org

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cr- 00253-AB |
| Plaintiff, | MOTION TO DISMISS FOR FIFTH AMENDMENT DUE PROCESS *BRADY* VIOLATION |
| v. | |
| HUGO GOMEZ-SOTO, | EVIDENTIARY HEARING AND ORAL ARGUMENT REQUESTED |
| Defendant. | |

Hugo Gomez-Soto moves this Court to dismiss Count One of the indictment with prejudice because the government failed to disclose exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and Mr. Gomez-Soto's Fifth Amendment Due Process rights, and this Court's Disclosure Order given at arraignment. Alternatively, Mr. Gomez-Soto moves this Court to order significant sanctions, including an adverse inference jury instruction as well as a special instruction that the government failed to comply with its constitutional obligations, suppression of Mr. Gomez-Soto's statements to law enforcement, and a limitation of scope and amount of expert

Page 1.      Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

testimony the government can elicit at trial. Count Two is not affected by this motion. Mr. Gomez-Soto requests the Court schedule evidentiary hearing and oral argument on this matter.

I.     **Relevant Factual and Procedural History**

This case centers on the December 30, 2023, overdose death of AV1 (decedent), which was initially investigated by Portland Police Bureau (PPB) Detective Michael Jones. Detective Jones arrested Hugo Gomez-Soto on January 25, 2024, following a controlled buy. Although two witnesses who spoke to law enforcement officers during the early stages of the investigation reported that the decedent had alternative sources of supply other than Mr. Gomez-Soto, and that information was also apparent from the decedent's cell phone, the information the witnesses disclosed about alternative dealers was never included in any report and effectively concealed from the defense until two years after the offense.

   A.     **Kathy Stafford contacted law enforcement on the day of the decedent's death to report information about a drug dealer.**

On December 30, 2023, the decedent collapsed in the kitchen at his family home from an apparent fentanyl overdose. Despite several injections of Narcan, advanced cardiovascular life support, and emergent medical care at the Oregon Health and Science University emergency department, the decedent passed away. The initial medical examination and family belief was the decedent died of a fentanyl overdose.

The same day, Kathy Stafford called PPB to report that she had information about a drug dealer potentially connected to the decedent's overdose death. Exhibit A (Computer Aided Dispatch Report – CAD), 3. Kathy Stafford is a close family friend to the decedent's mother, Randi Smith. Exhibit B (Kathy Stafford Interview Report) 1-3. Two officers, Todd Trapp and Austin Carlson, spoke briefly with Ms. Stafford on the phone. The officers referred Ms. Stafford to PPB's

Page 2.      Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

narcotics and organized crime unit (NOC) and cleared the call in their CAD report by saying, "Sounds like Mom of 55 knows several details regarding the dealer." Ex. A at 6.

> **B.    Detective Jones interviewed Randi Smith and Kathy Stafford but made no mention of any alternative source of supply in his report.**

A month later, on January 23, 2024, Detective Jones and Sergeant Erik Strohmeyer interviewed Randi Smith, the decedent's mother. Exhibit C (Jones Report) 1, 4. According to his report, Ms. Smith explained that the decedent had struggled with addiction for several years and had smoked fentanyl nearly daily in the garden shed behind her house. *Id.* at 1. Ms. Smith recounted the moments leading up to the decedent's overdose. She told Detective Jones that the decedent had a small container with fentanyl pills and powder with him when he collapsed. Ms. Smith handed law enforcement a small container of pills and a bag of powder. While Detective Jones's report fails to reference a tinfoil bundle, Ms. Stafford explained to the defense that Ms. Smith also provided Detective Jones with a tinfoil bundle she and Ms. Smith found in the shed after the decedent's overdose. Exhibit F (Kathy Stafford Supplemental Report), 1. She also provided the decedent's cellphone and gave PPB permission to go through the phone to "arrest the person that sold drugs" to her son. Ex. C at 4. Detective Jones did not record or take any notes of his interview with Ms. Smith on January 23, 2024.

Detective Jones's report of his conversation with Ms. Smith lacks any reference to the decedent having any other regular suppliers of fentanyl besides Mr. Gomez-Soto. It also lacks any identifying information about the other regular fentanyl suppliers. It also does not indicate that anyone other than Ms. Smith was present for the interview or that the interview took place at a café rather than at Ms. Smith's home at her adamant request. Finally, it lacks reference to Ms. Smith giving Detective Jones a tinfoil bundle with the drugs.

Page 3.      Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

### C. Detective Jones investigates the decedent's cell phone activity but only documents contact with Mr. Gomez-Soto and omits any communications with other dealers.

Detective Jones searched the decedent's phone and determined that the decedent texted Mr. Gomez-Soto on December 29, 2023, requesting to buy fentanyl powder and pills. Detective Jones documented his investigation of the phone by taking photos of text threads. Exhibit D (Jones Cell Phone Photos), 1-2. Additionally, some text messages are extracted from the decedent's cell phone. Exhibit E (Cell Phone Extraction Reports), 1-2. The documentation lacks any reference to other text threads viewed by Detective Jones or other potential suppliers of drugs. It is unclear whether Detective Jones saw these other communications with other fentanyl suppliers and suppressed these communications too. Mr. Gomez-Soto needs an evidentiary hearing to question Detective Jones about what he observed on the decedent's phone to determine whether exculpatory cell phone evidence was suppressed.

### D. Mr. Gomez-Soto is arrested and charged first by the state and then by the federal government, but no discovery reveals the evidence about alternative suppliers of drugs.

After the controlled buy on January 25, 2024, Detective Jones arrested Mr. Gomez-Soto on state charges. Mr. Gomez-Soto was arraigned in state court and appointed a state defense attorney. The state provided discovery to his state defense attorney, but the discovery lacked any reference to an alternative drug supplier for the decedent.

A year and a half later, on June 18, 2025, the government indicted Mr. Gomez-Soto on one count of distribution of fentanyl resulting in death (Count One) and one count of possession with intent to distribute fentanyl (Count Two), in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C). ECF 3. Count Two is based on the controlled buy and is not at issue in this motion. At arraignment,

Page 4.  Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

the Court reminded the government of its obligations pursuant to *Brady v. Maryland* and issued a *Brady* Disclosure order. ECF 8. The Court also specifically advised the government of the potential consequences for failure to disclose exculpatory information: "The consequences for violating either this Disclosure Order or the government's obligations under *Brady* include, but are not limited to, the following: contempt, sanction, referral to a disciplinary authority, adverse jury instruction, exclusion of evidence, and dismissal of charges." ECF 8. The defense still did not receive any information about any witnesses or cell phone evidence indicating potential alternative sources of supply.

> **E.     In mid-July and September 2025, the government for the first time provides discovery about alternative dealers following PPB Detective Travis Law's forensic investigation into the decedent's phone.**

When the state transferred this case to the federal government, PPB Detective Travis Law became the case agent for the government. On June 20, 2025, PPB Detective Travis Law began a forensic review of the decedent's phone. In his report, Detective Law notes that it was a prior drug dealer who allegedly connected Mr. Gomez-Soto to the decedent. Detective Law also found another phone number that appeared to sell the decedent fentanyl from mid-September 2023 through early November 2023, one month before his death.

On August 29, 2025, Detective Law completed another review of the decedent's cell phone's data and found three other fentanyl suppliers. Detective Law documented these three individuals and their communications with the decedent in November 2023 and early December 2023. Most relevantly, he noted an individual named Ryan with a phone number ending in 7616. Detective Law's report was completed on August 29, 2025. Both of Detective Law's reports were

Page 5.     Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

disclosed to the defense for the first time on September 5, 2025, over 20 months after the decedent's overdose.

### F. Defense investigation discovers that Detective Jones withheld information about the decedent's alternative fentanyl sources.

On January 23, 2026, defense investigator Dash Terry contacted Kathy Stafford to ask about her initial report to PPB on December 30, 2023. Ms. Stafford revealed that she was present when Ms. Smith met with Detective Jones and Sergeant Strohmeyer on January 23, 2024. Exhibit B at 1; Ex. G at 1. She noted that the meeting took place at a café at Ms. Smith's insistence. Ex. G. At the meeting, Ms. Smith told the officers about a drug dealer that the decedent would buy from named "Ryan." Ex. B at 1; Ex. G. Ms. Smith described the car Ryan drove, although Ms. Stafford was not sure whether Ms. Smith also provided his license plate number. Ex. B at 1; Ex. F at 1. Ms. Stafford also noted that she and Ms. Smith had collected a tinfoil bundle of drugs from the garden shed a few days after the decedent's death. Ex. B at 2; Ex. F. Ms. Stafford observed Ms. Smith provide that bundle to Detective Jones along with the decedent's cellphone on January 23, 2024. *Id.*

When Ms. Stafford initially contacted Detective Jones about meeting, she told him that the meeting must occur away from Ms. Smith's home because Ms. Smith feared retaliation from this drug dealer. Ex. B at 1. When interviewed by defense investigator Dash Terry, Ms. Stafford recounted a time when a dealer threatened the decedent. She noted to Mr. Terry that several years prior, the decedent owed money to his dealer, who Ms. Stafford believes was Ryan. Ryan called the decedent and threatened him, including possibly shooting up the decedent's mother's home. Ex. B at 1; Ex. G. Ryan had texted the decedent a photo of what appeared to be a severed finger. Ex. G.

Page 6.     Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

After the meeting with Detective Jones and Sergeant Strohmeyer, Ms. Stafford asked Ms. Smith why she had not provided Ryan's car license plate to law enforcement, Ms. Smith said that "her son was finding other drugs without her providing transportation, and Law Enforcement was potentially not interested in it." Ex. F at 1.

In the federal and state court pleadings and discovery, there is no mention of the fact that two witnesses—Randi Smith and Kathy Stafford—told law enforcement officers about a drug dealer named Ryan during the early stages of this overdose investigation. There was no mention of Kathy Stafford attending the meeting with Ms. Smith, Detective Jones, and Sergeant Strohmeyer at a café on January 23, 2024. Detective Jones's reports and state-court probable cause affidavit lack any reference to critical details about an alternative source of supply named Ryan, the description of his car, a possible license plate number, or the decedent's and Ms. Smith's fear of that dealer. Nor is there any mention of the tinfoil bundle provided to law enforcement. None of that information was ever disclosed to defense counsel in state or federal court. Indeed, the CAD report from December 30, 2023, contains the only mention of Kathy Stafford in discovery. But for the defense investigation in January 2026, the early disclosure of alternative sources of supply would never have come to light.

## II.  Legal Standards

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Court subsequently held that the "duty to disclose such evidence is applicable even though there has been no request by the accused." *United States v. Agurs*, 427 U.S.

Page 7.    Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

97, 107 (1976). The government's disclosure obligations encompass impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

The appropriate "test for pretrial disclosure of exculpatory evidence" is "whether the evidence is favorable to the defense." *United States v. Cloud,* 102 F.4th 968, 979 (9th Cir. 2024) (internal quotations omitted). "[T]o the extent that the prosecution doubt[s] 'the usefulness of the evidence,' the government 'should resolve such doubts in favor of full disclosure.'" *United States v. Bundy*, 968 F.3d 1019, 1040 (9th Cir. 2020) (internal citations omitted). "Evidence is suppressed where it is known to the state and not disclosed to the defendant." *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015); *see also Edwards v. Ayers*, 542 F.3d 759, 768 (9th Cir. 2008) ("Suppression by the prosecution, whether willful or inadvertent, of evidence favorable to the accused and material to either guilt or punishment violates the Constitution.").

There are three elements to establish a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The "materiality standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials. . . Rather, we observed that the proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses." *United States v. Cloud*, 102 F.4th 968, 979 (9th Cir. 2024) (internal citations omitted).

Separately from the constitutional *Brady* standard, this Court's Disclosure Order provided at arraignment was not limited to *material* evidence. Rather, it required disclosure of "*all*

Page 8.   Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

information or evidence known to the government relating to guilt or punishment that might reasonably be considered favorable to the defendant's case[.]" ECF 8 (emphasis added).

**III.     The government violated *Brady* and this Court's Disclosure Order by failing to timely disclose exculpatory evidence.**

The government's failure to timely disclose information discovered early in the overdose investigation about the decedent's other suppliers, including the specific details reported by Ms. Smith and Ms. Stafford about "Ryan" and the decedent's communications with other suppliers,[1] is exculpatory evidence that the government suppressed, resulting in prejudice to the defense. Two years have passed since Randi Smith first told Detective Jones about Ryan, describing his car and possibly his license plate. By omitting that information from his report and keeping it from the defense, Mr. Gomez-Soto lost valuable investigative leads. Now, Mr. Gomez-Soto must work with faded memories, destroyed records, and fact witnesses who have been told by the government that Mr. Gomez-Soto supplied the fentanyl that killed the decedent. The government's failure to timely disclose exculpatory evidence robbed Mr. Gomez-Soto of a strong alternative perpetrator defense.

**A.     The undisclosed evidence about alternative suppliers is exculpatory.**

Count One charges Mr. Gomez-Soto with distribution of fentanyl resulting in death. That charge requires the government to prove that Mr. Gomez-Soto knowingly distributed fentanyl to the decedent, that Mr. Gomez-Soto knew the substance was fentanyl or some federally controlled substance, that the decedent used Mr. Gomez-Soto's fentanyl, and that the fentanyl delivered by

---

[1] As noted previously, the defense requests an evidentiary hearing to explore with Detective Jones what other communications he explored in the decedent's cell phone during his review of the decedent's cell phone.

Page 9.     Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

Mr. Gomez-Soto caused the decedent's death. If another person may have supplied the drugs that caused the decedent's death, that would be an absolute defense to the resulting in death charge.

Evidence is favorable to the accused if it is either exculpatory or impeaching. *Cloud*, 102 F.4th at 979. "If information would be advantageous to the defendant, or would tend to call the government's case into doubt, it is favorable." *Comstock*, 786 F.3d at 708. In this case, two witnesses told Detective Jones about an additional drug dealer who regularly sold drugs to the decedent. That information strengthens the defense by providing an alternative suspect who may have sold the decedent the fatal dose. The omission of that information, leaving only Mr. Gomez-Soto as a potential drug source, was a crucial and damaging omission.

Importantly, *any* evidence that is favorable to the defendant's case, no matter how probative, is favorable and exculpatory. "[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is by definition favorable." *Comstock,* 786 F.3d at 708. Thus, Mr. Gomez-Soto does not have to show that any of the other suppliers were likely sources of the drugs that caused the overdose to establish a *Brady* violation. The lead to other potential suspects was exculpatory and should have been shared with the defense.

B.    **The government willfully or inadvertently suppressed evidence**

Detective Jones' omission of critical evidence regarding other drug dealers constitutes suppression of *Brady* evidence. "The term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor … omission[s] are equally within Brady's scope." *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009); *see Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) ("[T]he terms 'suppression,' 'withholding,' and 'failure to disclose' have the

Page 10.    Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

same meaning for Brady purposes."). "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "As a matter of law, the prosecution is deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020) (internal quotation marks and citation omitted). The Fifth Circuit Court of Appeals consistently "decline[d] 'to draw a distinction between different agencies under the same government, focusing instead upon the "prosecution team" which includes both investigative and prosecutorial personnel.'" *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (quoting *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979)).

Here, knowledge of the information Detective Jones received about other suppliers, including Ryan, is imputed to the government, and the government had a duty to disclose it. The PPB was the only law enforcement agency that investigated the overdose of the decedent, first during the state prosecution and then when the case was indicted federally. Detective Jones led the initial investigation of the decedent's overdose, and approximately one and a half years later, PPB Detective Travis Law continued the investigation for the federal government. Yet the first disclosure of any evidence about alternative suspects did not occur until nearly 20 months after the overdose when Detective Law independently searched the decedent's phone and disclosed the contents in his reports. And the government never disclosed Ms. Smith's and Ms. Stafford's statements about Ryan, which the defense learned of through its own independent investigation two years too late. Whether the omissions were negligent or intentional does not matter when analyzing whether suppression occurred under *Brady*. *See Giglio v. United States*, 405 U.S. 150,

Page 11.     Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

154 (1972) ("Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."); *Kyles*, 514 U.S. at 437-38 (whether the suppression resulted from good or bad faith, the prosecutor's responsibility is inescapable). The exculpatory evidence learned by law enforcement during its investigation was not timely disclosed.

  **C. The lengthy withholding of evidence of alternative sources of supply prejudiced Mr. Gomez-Soto.**

  The final factor in the *Brady* analysis asks whether the failure to disclose the exculpatory evidence was prejudicial. *Price*, 566 F.3d at 911. The proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses. *Cloud*, 102 F.4th at 979 (citing *Price*, 566 F.3d at 913 n.14) (internal quotation marks omitted). "[T]he retrospective definition of materiality is appropriate only in the context of appellate review," and "trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial." *Cloud*, 102 F.4th at 979 (quoting *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013)).

  The suppression of evidence of other drug dealers who regularly supplied the decedent hindered Mr. Gomez-Soto's defense by preventing timely investigation. "Whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here. Rather, the materiality inquiry should evaluate the relative value of the withheld evidence on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." *Cloud*, 102 F.4th at 980.[2] In this case, the defense learned of this

---

  [2] In the *Brady* context, prejudice and materiality are interchangeable terms. *Id.*

Page 12.  Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

additional exculpatory evidence approximately two years after the government. The defense has lost the ability to investigate an alternative supplier and learn information contemporaneous to the death.

Without the identifying information Ms. Smith provided to law enforcement, Mr. Gomez-Soto lost key investigative leads that would have helped learn Ryan's identity and connect him to the overdose. Although the defense has attempted to follow the lead despite the lapse of time, records are dated, and memories are faded. For example, one potential match for a person who could be "Ryan" no longer has a specific car or license plate in the defense investigator's search records. Similarly, the treasure trove of data that would have been available in Ryan's cell phone records in January 2024 no longer exists. Those records would have documented Ryan's communications with the decedent and potentially provided location data for December 2023 through his phone provider. But those types of phone records are not ordinarily kept for two years.[3] And witness or other potential leads that could help the defense find Ryan, interview him, and subpoena him to testify at trial, have gone cold.

Finally, the loss of the tinfoil bundle is critical because the defense no longer can use objective forensic scientific methods to connect that tinfoil bundle to Ryan rather than Mr. Gomez-Soto. Without the tinfoil bundle, Mr. Gomez-Soto cannot test drug residue on the tinfoil bundle to compare the decedent's drugs to the drugs seized from Mr. Gomez-Soto. Additionally, Mr. Gomez-

---

[3] Some providers/carriers maintain basic metadata for the accounts for over two years, but not many. *See* Ben Bierce, *How Long Do Phone Companies Keep Their Records?*, Brave Investigations, March 31, 2025, https://braveinvestigations.com/how-long-do-phone-companies-keep-their-records/; Keith Lewis, *Privacy advocates demand rules for mobile providers on data use*, Roll Call, September 6, 2022, https://rollcall.com/2022/09/06/privacy-advocates-demand-rules-for-mobile-providers-on-data-use/.

Page 13.    Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

Soto cannot test the tinfoil bundle for DNA to see if Mr. Gomez-Soto's DNA is present, or whether other individuals' DNA was present. Moreover, the fact that law enforcement destroyed or lost key physical evidence is also independently exculpatory evidence because of its value to impeach the law enforcement investigation. Yet that information as well was never provided to the defense.

The two-year delay in disclosing information about the decedent's other suppliers has handicapped Mr. Gomez-Soto's ability to present an alternative perpetrator defense, violating Mr. Gomez-Soto's constitutional rights on Count One. In the context of pre-indictment delay under the Fifth Amendment Due Process Clause, courts have found sufficient prejudice to warrant dismissal where the delay has resulted in faded witness memories, lost evidence, and other impairments to presenting a complete defense:

- Finding a six-month delay in bringing prison assault indictment required dismissal where the government failed to interview or keep a list of incarcerated witnesses. *United States v. Morrison*, 518 F. Supp. 917, 918-19 (S.D. N.Y. 1981).

- Finding a six-year delay in an arson case required dismissal where three witnesses had died, other witnesses' memories were impaired, and physical evidence was lost. *United States v. Sabath*, 990 F. Supp. 1007, 1013-19 (N.D. Ill. 1998).

- Finding delay in bank robbery indictment violated the Due Process Clause where the defendant's alibi defense was prejudiced by faded memories of those with whom he worked at time of robbery. Order, *United States v. Johnson*, No. 84-4-RE (D. Or. Feb. 25, 1985).

The *Brady* violation in this case is analogous because hiding the core "alternative dealer" defense for two years hindered timely investigation and caused all the same types of prejudice identified in the pre-indictment delay cases.

The government may argue there is no prejudice because the defense learned of the suppressed evidence prior to trial. The Ninth Circuit rejected that argument in *Cloud*, which

Page 14.    Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

involved impeachment evidence discovered before the witness testified at trial. The Ninth Circuit declined to entertain the slippery slope argument that prejudice was lacking:

> [T]he Government asks us to create a perverse rule: that it cannot be sanctioned for withholding impeachment evidence about a critical witness whose testimony could have been determinative of guilt or innocence, simply because the district court caught its misconduct *too early*. This argument, if taken to its logical extreme, could risk preventing a trial judge from imposing *any* forward-looking *Brady* sanction under the rationale that there can be no due process violation unless and until the court permits the government's concealment of evidence to fatally taint the trial's result. Our precedents, however, foreclose that argument.

*Cloud*, 102 F.4th at 981. Accordingly, such an argument must be rejected, and the government should be held to account for failing to produce this exculpatory evidence.

**IV.     The Court should dismiss the indictment or, alternatively, order significant sanctions to limit the prejudice caused by the government's *Brady* violation.**

A court may use its "supervisory power to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations before a jury; and to deter future illegal conduct." *United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008) (internal quotations omitted); s*ee also United States v. Lopez*, 4 F.3d 1455, 143-64 (9th Cir. 1993) (stating federal courts are empowered to deal with "threats to the integrity of the judicial process"); *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) (finding dismissal can be used as a tool to discourage future deliberate prosecutorial impropriety). A court may dismiss an indictment with prejudice for a *Brady* violation where it finds "(1) flagrant misbehavior and (2) substantial prejudice." *Bundy*, 968 F.3d at 1031 (internal quotation and citation omitted).

The government's failure to provide this exculpatory evidence rises to the level of flagrant misbehavior because it constitutes reckless disregard of the government's constitutional

Page 15.     Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order

obligations. *See Chapman*, 542 F.3d at 1085 (explaining that flagrant misbehavior embraces reckless disregard for the prosecution's constitutional obligations). "Flagrant" misconduct need not be intentional. *Id.* (finding the prosecution's untimely disclosures flagrant where the prosecution had 22 months to provide discovery in a complex case involving over 400,000 pages of documents); *Bundy*, 968 F.3d at 1041 (finding that the prosecution's withholding of documents amounted to reckless disregard of its obligations). Here, the evidence was so clearly exculpatory that reasonable minds could not differ on the need for disclosure. And as discussed above, the failure to disclose let a promising lead for defense investigation go cold, establishing prejudice.

Dismissal is warranted here. The evidence suppressed by the government was core exculpatory information that any law enforcement officer would have understood was subject to timely disclosure to the defense. From the very beginning of the investigation into decedent's death, Detective Jones learned of exculpatory evidence about alternative suppliers from Ms. Stafford and Ms. Smith and possibly from the decedent's cell phone which he then omitted from his reports, resulting in the information being hidden from the defense. Detective Jones is a member of the investigative portion of the prosecution team. His decision to suppress exculpatory evidence would not have come to light absent independent defense investigation two years after the fact. Assessing the exculpatory nature of information about alternative suppliers is not a difficult or complex decision requiring a law degree. It is as straightforward a *Brady* obligation as exists.

Alternatively, if the Court does not dismiss the indictment, Mr. Gomez-Soto requests that the Court impose significant alternative sanctions to dissuade future misconduct and to ameliorate the prejudice to Mr. Gomez-Soto's defense, including an adverse inference jury instruction as well

as a special instruction that the government failed to comply with its constitutional obligations. "When considering an exercise of its supervisory powers, a district court has various options," including remedies such as "limit[ing] the witnesses or testimony offered by the government, or [] sanction[ing] the attorneys." *Bundy*, 968 F.3d at 1031; *United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018). In *Garrison*, the government failed to timely disclose information to the defense. 888 F.3d at 1061. Instead of dismissal, the district court instructed the jury that "the government's failure to comply with its constitutional obligations . . . could lead the jury to find reasonable doubt." *Id*. at 1066.

Other alternative sanctions could include suppressing all unrecorded statements made by Mr. Gomez-Soto to Detective Jones and Officer Randy Castaneda during and after his arrest on January 25, 2024. Mr. Gomez-Soto was interviewed on the scene during his arrest and also at the police station shortly afterwards. While the interview on scene was recorded, the officers chose not to record their interrogation of Mr. Gomez-Soto at the police station, nor were any notes taken. The only memorialization of the interview is Detective Jones's report. Given his history of omitting material, exculpatory information from the report of his interview with Randi Smith, the report of Mr. Gomez-Soto's interview cannot be deemed reliable, and suppression of Mr. Gomez-Soto's unrecorded statements would be appropriate.

The Court could also limit the scope of the government's proffered expert witness testimony. The government proposes using several expert witnesses, including PPB Detective Travis Law, FBI Special Agent Gutierrez, Forensic Scientist Jonathan Dyer, Forensic Scientist Dr. Ngan Vo, and Forensic Chemist Shelli Martinez. Detective Law and Special Agent Gutierrez will provide unsupported expert testimony about drug users' habits for the government to compare to

the decedent's drug use habits. Mr. Dyer and Dr. Vo seemingly will testify that the fentanyl found on Mr. Gomez-Soto was consistent with the fentanyl recovered by Randi Smith and Kathy Stafford, implicating Mr. Gomez-Soto as the sole supplier for the decedent. The specific testimony excluded or suppressed could be decided after the *Daubert* hearings for the expert witnesses.

## V.　　CONCLUSION

For the foregoing reasons, the Court should dismiss the indictment against Mr. Gomez-Soto with prejudice. Alternatively, the Court should grant significant sanctions, including an adverse inference instruction and an instruction on the government's failure to comply with its constitutional obligations, as well as exclusion or limitation of relevant government evidence.

Respectfully submitted on this February 23, 2026.

*/s/ Ryan Costello*
Ryan Costello, IL SB #6317378

*/s/ Megha Desai*
Megha Desai, OSB #141441

Page 18.　　Motion To Dismiss For Violation Of Brady And Violation Of Court's Disclosure Order