SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Scott.Kerin@usdoj.gov
**NICOLE M. BOCKELMAN, OSB #105934**
Nicole.Bockelman@usdoj.gov
**SARAH BARR, WSBA #40758**
Sarah.Barr@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:25-CR-00253-AB |
| v. | **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION** |
| **HUGO GOMEZ-SOTO,** | **TO DISMISS FOR ALLEGED DUE PROCESS *BRADY*** |
| Defendant. | **VIOLATION** |

I.      INTRODUCTION

Defendant claims the government committed a *Brady* violation; there is no *Brady* violation in this case. Defendant is charged with supplying the fentanyl that caused an overdose death in December of 2023. Defendant claims the government just recently supplied information regarding another possible alternative drug supplier for the victim, and he seeks dismissal based on speculation that the lead detective hid this evidence deliberately. Nothing could be further from the truth. In fact, defendant has had information about an alternative drug source since the

Multnomah County District Attorney's Office provided him with an extraction report from the victim's phone long before the case was referred for federal prosecution. The government reproduced the victim's cell phone extraction in this case within 14 days of his arraignment on the federal indictment. *Brady* dictates fairness under the Due Process Clause, and it relates to information, regardless of form. Although the defense developed a different route to the alternative source information, the government did not possess the information gathered by the defense investigator, and therefore, it suppressed nothing material to this case. The defense motion to dismiss or for other sanctions should be denied.

## II.     FACTUAL BACKGROUND

### A.     Defendant Sold Adult Victim 1 Fentanyl and Adult Victim 1 Died

On December 29, 2023, defendant sold fentanyl to a 29-year-old man (Adult Victim 1). AV1 used the fentanyl a day later and collapsed on his mother's kitchen floor shortly after his use. AV1's mother, Randi Smith, gave her son multiple doses of Narcan and called 911 at 11:32 A.M. As a result of the 911 call, the Bureau of Emergency Communications generated a CAD Call history, documenting AV1's mother's call and the paramedics' response. (Ex. 1). AV1 was rushed to the Oregon Health and Science University Emergency department, but died of cardiac arrest secondary to opioid use.

### B.     Initial Law Enforcement Contact

Hours after the 911 call, on December 30, 2023, at 4:47 P.M., Kathy Stafford, a friend of Randi Smith, called the police to request that the police contact her because she said that she, "has info for dealer" and had some concerns. (Ex. 2). Portland Police Bureau (PPB) Officer Todd Trapp called Kathy Stafford and provided the PPB Narcotics and Organized Crime Unit (NOC) contact information. Officer Trapp noted in details of the call in the CAD Log, "sounds

like mom of 55 knows several details regarding the dealer." (Ex. 2).  Police did not initially respond to the scene or meet witnesses in person.

### C.     Detective Jones Took a Statement from Randi Smith

Approximately three weeks later, on January 23, 2024, Portland Police Detective Michael Jones and Sergeant Strohmeyer met with AV1's mother Randi Smith to take her statement. Detective Jones was the primary point of contact and spoke with Ms. Smith; Sergeant Strohmeyer accompanied Detective Jones and was available to provide support if necessary.  In his initial report, Det. Jones stated that he met with Randi Smith and that Ms. Smith explained that she is AV1's mother, that AV1 had been struggling with fentanyl, and that he would smoke fentanyl before work in the shed in her backyard.  Ms. Smith described the events of the day her son died, and what she did to try to save him.  Ms. Smith told Det. Jones that AV1 had a small container with fentanyl pills and powder with him when he collapsed and she provided that container to Det. Jones.  Ms. Smith also provided AV1's cellphone to police and told Det. Jones that police could use AV1's phone to arrest the person that sold drugs to AV1.

Det. Jones looked through AV1's phone and found a recent text thread between AV1 and a person using a phone number ending in -7908 (later determined to be defendant).  Det. Jones saw that AV1 bought 20 blue and 90 powder on December 29, 2023, the night before the overdose, from the person using -7908.  (Ex. 3).  In his initial review of AV1's phone, he saw no other messages indicating that AV1 purchased drugs from anyone else the week that he died. Law enforcement had no information about any specific source before reviewing the phone.

### D.     AV1's Phone was Collected and Extracted

The officers delivered AV1's phone to the PPB Digital Forensics Unit (DFU) the same day Ms. Smith gave it to them.  Officers with DFU extracted the contents of AV1's phone and

**United States' Opposition to Defendant's**                                                                          Page 3
**Motion to Dismiss re Discovery Claims**

downloaded the extraction report. (Ex. 4). This extraction report included all calls to and from AV1 from February 27, 2021, to January 22, 2024, and text message communications from March 29, 2013, to January 23, 2024.

### E. Defendant's Arrest

On January 25, 2024, PPB Officer Randy Castaneda, posing as AV1, used AV1's phone to send a series of text messages to the defendant's phone requesting to purchase "80 powder and 20 blue." Defendant was unaware that AV1 had died and agreed to the sale and agreed to meet near AV1's house. When defendant arrived to complete the deal, he texted that he was "here" and that he was in a "Ford funsion [sic]." Police found defendant in a Ford Fusion while he waited for AV1. The police arrested defendant and confirmed that defendant possessed and had been using the cellphone with the number ending in -7908 that police called to order the fentanyl. Police searched defendant and found 20 blue fentanyl pills and two small baggies of fentanyl powder.

### F. State Prosecution and Discovery

On **January 26, 2024**, the Multnomah County District Attorney's Office filed an Information in Multnomah County Circuit Court case #24CR04413, charging defendant with Criminally Negligent Homicide, 2 counts of Unlawful Delivery of a Controlled Substance and 2 counts of Unlawful Delivery of a Controlled Substance within 1,000 Feet of a School. As part of the state case, the district attorney's office provided a copy of AV1's phone extraction to defense counsel in discovery on **November 18, 2024**. (Ex. 5).

### G. Federal Prosecution and Discovery

On **June 18, 2025**, a federal grand jury in the District of Oregon returned an indictment charging defendant with Distribution of Fentanyl Resulting in Death and Possession with Intent

to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). The state case was dismissed. Defendant was arraigned on his federal case on **July 2, 2025**. On **July 15, 2025**, as part of its discovery in the federal case, the government provided defendant the extraction report of AV1's phone (previously provided in the state case), which contained all of AV1's sources of fentanyl who communicated with him in the prior three years (calls) or ten years (text messages), the substance of the text communications, and their contact information. On **August 29, 2025**, Detective Law wrote a report documenting his review of the communications on AV1's phone (Ex. 6). Detective Law specifically lists "Ryan" as an alternate source, discusses the communications and notes that "communications ceased on or about November 23, 2023." The government gave this report to defendant in discovery on **September 5, 2025**.

### H.    Federal Public Defender Investigator Interviews Kathy Stafford[1]

On January 23, 2026, Federal Public Defender Investigator Dash Terry met with Kathy Stafford at Ms. Stafford's home. Ms. Stafford is a friend of Randi Smith and went with Ms. Smith to support her during her interview with Det. Jones, although she did not participate. Ms. Stafford told Mr. Terry that AV1 had "two suppliers." Def. Ex. B at 1. She described to Mr. Terry a meeting that she set up on an unidentified date to talk to Portland police officers with Ms. Smith, who was reluctant to contact law enforcement herself because she feared retaliation from AV1's drug dealer. *Id*. Mr. Terry reports that Ms. Stafford "believes" the officer she met was "Travis Law and another officer, but she was not sure." *Id*. She told Mr. Terry that Ms. Smith gave the officers AV1's phone at that meeting and "provided the information of who she

---

[1] Quotations in this section quote material from Mr. Terry's report of his interview with Ms. Stafford. The report itself is a summary and contains no direct quotes memorializing exactly what Ms. Stafford said.

**United States' Opposition to Defendant's**                                                                     **Page 5**
**Motion to Dismiss re Discovery Claims**

believed [AV1] was buying from and described a vehicle." *Id*. Mr. Terry reports that Ms. Stafford "believes she also provided a license plate number and the name of a man named 'Ryan,' if she remembers correctly," who she said, "was one of [AV1's] two suppliers." *Id*. The report is unclear who the "she" is that was believed to have provided the license plate and name "Ryan"—Ms. Smith or Ms. Stafford. *Id*. Ms. Stafford also relayed that she "did not know about a tin of drugs" but noted that "a bundle or tinfoil of drugs was all they found, and that was given to Law Enforcement." *Id*. at 2. She conveyed that Ms. Smith would drive AV1 to buy drugs from Ryan down the hill from their house, later giving a time frame for a last known deal with Ryan of "a few years ago." Def. Ex. B at 2, G at 1.

On February 2, 2026, Mr. Terry called Ms. Stafford again to clarify her earlier statements. When asked to confirm whether she and Ms. Smith "had provided Portland Police with the license plate to the vehicle of the additional drug supply," she clarified that "Randi Smith had told [her] that she had the license plate but could not find it." Def. Ex. F. at 1. She also explained that Ms. Smith told her that AV1 was obtaining drugs "without [Ms. Smith] providing transportation." *Id*. She clarified the "leftover drugs they had found at the house" were "in a tinfoil bundle." *Id*.

On February 19, 2026, Mr. Terry and defense counsel Ms. Desai met with Ms. Stafford again for even more clarification. Ms. Stafford offered that she now "believes" it was Detective Jones who she and Ms. Smith met with and that "Detective Law communicates with Ms. Smith directly." Def. Ex. G at 1. Ms. Stafford reported she "believes" Ms. Smith "talked to detectives about [AV1's] dealer 'Ryan' because," according to Ms. Stafford, "Ms. Smith didn't know anything about Hugo Gomez-Soto dealing to [AV1]." *Id*. Ms. Stafford confirmed that when she first called 911 on the day AV1 overdosed, she "let the officer know that Ms. Smith had

information about a dealer related to [AV1's] death" but "did not mention Ryan by name on that call." *Id*.

### I. Detective Jones's Supplemental Report

On February 17, 2026, Det. Jones prepared a supplemental report confirming the accuracy of his initial report documenting his meeting with Ms. Smith. Ex. 7 at 3. Det. Jones explained he "met with Randi Smith" who was "accompanied by another lady" whose name he did not recall and who "seemed to provide Randi with emotional support," but "did not provide anything of evidentiary value." *Id*. He confirmed that his "initial report" regarding "the interview with Randi Smith" is "accurate." *Id*. Ms. Smith "did not give [the officers] specific information regarding who [AV1] was buying fentanyl from," but did give them his cell phone and kept the cell service active so that officers could use it to find the dealer. *Id*. Further, neither Ms. Smith nor Ms. Stafford provided "a name nor license plate of a possible drug dealer." *Id*. Det. Jones checked the property room on February 13, 2026, and confirmed that the "container" Ms. Smith handed over was "a small white container with a screw off lid" containing fentanyl powder and blue fentanyl pills, and "no tin foil." *Id*. Moreover, Det. Jones reviewed his database search history for license plates searches for the date range January 23, 2024 to January 27, 2024, and found nothing associated with this case. *Id*. Had he received full or partial license plate information, he would have queried a search that would have shown up in his history. *Id*. at 4.

### III. LEGAL STANDARD

The "animating purpose" of the *Brady* rule is "to preserve the fairness of criminal trials." *Morris v. Ylst,* 447 F.3d 735, 742 (9th Cir. 2006). Pretrial criminal discovery is governed by Rule 16, the Jencks Act, and *Brady* and its progeny. *Cf. United States v. Agurs*, 427 U.S. 97, 106

(1976) ("there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor"). Each of these rules feeds into the well-established mandate that the government disclose evidence which is both favorable to the defendant and material either to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

"There are three components of a true *Brady* violation: The evidence at issue must be: (1) favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Stickler v. Greene*, 527 U.S. 263, 281–82 (1999). "[T]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* material'—although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. The government has an "affirmative duty to disclose" favorable information to the defendant before trial, and in sufficient time for the defense to make effective use of that information. *United States v. Cloud,* 102 F.4th 968, 976 (9th Cir. 2024).

## IV.     DISCUSSION

Defendant argues that the government failed to disclose information about alternative dealers "in any report" even though, according to him, two witnesses reported that AV1 had alternative sources and the extraction report showed it. ECF No. 76 at 2. He says the government's suppression of evidence is apparent because Det. Jones's report lacks (1) "any reference to [AV1] having any other regular suppliers of fentanyl besides Mr. Gomez-Soto"; (2) information about "the other regular fentanyl suppliers"; (3) notation of the location of the interview or the presence of the supporting friend; and (4) any reference to a "tinfoil bundle" that

Ms. Stafford two years later told a defense investigator Ms. Smith gave investigators as found in a shed. ECF No. 76 at 3. These allegations are meritless on their face.

Defendant acknowledges that the identification of possible alternative suppliers came from the forensic phone examination. That was *after* the interview. There was no factual basis to include that unknown information in Det. Jones's report, nor was there reason to put phone extraction information in a report that documented the interview of Ms. Smith, the witness providing information. Instead, the phone content information is in two other reports—the extraction report and Det. Law's report analyzing the extraction—both of which were promptly turned over to defendant in discovery within three months of indictment. ECF No. 76 at 5. Defendant concedes these reports were turned over and admits they contained the information of other possible suppliers—including "an individual named Ryan." *Id*. Defendant's real complaint is that investigators focused their investigation on him—the person whose text messages established a drug sale the night before the overdose—rather than other possible suppliers speckled within the phone extraction that predated his involvement, but even if true that's a sloppy investigation defense to be raised, not a *Brady* violation. ECF No. 76 at 4. Defendant timely received the information allegedly missing from Det. Jones's report. That ends the *Brady* inquiry.

In any event, Ms. Stafford's vague and speculative statements to the defense investigator about events two years earlier, which she expressly cautioned were unreliable, does not show that Det. Jones failed to document material information. Her statements do not establish Det. Jones learned the identity of any named supplier, including "Ryan," during Ms. Smith's interview or that Det. Jones received a "tinfoil bundle" then. Finally, the absence of the interview location and presence of a supporting friend who gave no evidentiary information are not

**United States' Opposition to Defendant's**                                             **Page 9**
**Motion to Dismiss re Discovery Claims**

material omissions. In any event, the government timely turned over the CAD report—which contains the name and phone number of that friend and allows the same (alleged) inference, if any, that the friend may be worth following-up with. Which of course defendant has done, well in time to prepare for trial.

Defendant's request for dismissal of Count 1, "significant sanctions, including an adverse inference jury instruction as well as a special instruction that the government failed to comply with its constitutional obligations," suppression of defendant's statements, and limitations on expert testimony, must be denied. ECF No. 76 at 2. Additionally, there is insufficient basis for an evidentiary hearing, and that request must be denied too.

### A. The Government turned over the reports containing the sought-after information.

Defendant acknowledges the government turned over the extraction report and an analysis of the extraction within three months of federal indictment. And of course, defendant already had the extraction report seven months before federal indictment, when the state turned it over in its case. Defendant has the allegedly "exculpatory" information and possessed it even before he was charged in federal court. He is free to use it at trial. Defendant has shown no adverse impact in his ability to prepare for trial, given that he got the reports more than a year-and-a-half before trial.

### B. The Government did not suppress any evidence.

Defendant's claim that Det. Jones suppressed evidence in his interview report is meritless, even putting aside that defendant received the same alleged "missing information" through other reports. Defendant claims "two witnesses…spoke to law enforcement officers

///

during the early stages of the investigation and reported that the decedent had alternative sources of supply other than Mr. Gomez-Soto". (ECF 76, pg. 2). This is wrong.

First, the record does not establish that any witness reported alternative sources of supply to the investigators. Ms. Stafford said she called law enforcement the day AV1 overdosed and mentioned having dealer information (which turned out to be the defendant) but "did not mention Ryan by name on that call." Def. Ex. G at 1. The CAD report taken from that call backs that up. It says only that it "sounds like" the mother "knows several details regarding the dealer" and "contact has info for dealer." Def. Ex. A at 3, 5. That dealer was defendant. The CAD report did not identify multiple fentanyl supply sources—or any alternate sources for that matter. The CAD report was neither facially exculpatory nor did it give rise to a need to track down Ms. Stafford. Indeed, it was not until January of 2026 that Ms. Stafford first told the defense investigator about a possible alternative fentanyl supply source named "Ryan", a source defendant already knew about from the government's discovery. Ms. Stafford also disclosed for the first time that AV1's mother may have been less than forthcoming with officers because she feared reprisal from AV1's supplier.

Second, only one person provided a statement to Detective Jones—Randi Smith, at the meeting on January 23, 2024. Her statement is memorialized in Det. Jones's report, and she did not identify any fentanyl supply sources, tell the officers that AV1 had multiple sources of supply, or provide information about a vehicle, a license plate or a person named "Ryan." Ms. Smith did provide "a small container with fentanyl pills and powder" that she had recovered from AV1 after he collapsed, as well as AV1's cell phone. Det. Jones's supplemental report confirms that his "initial report" was "accurate" and documents additional investigation that corroborates that accuracy. Ex. 7 at 3

**United States' Opposition to Defendant's**            **Page 11**
**Motion to Dismiss re Discovery Claims**

The government cannot be faulted for failing to disclose information it did not possess. *United States v. Blowers,* 268 Fed. Appx. 504, *1 (9th Cir. 2008), *citing, Sanchez v. United States,* 50 F.3d 1448, 1453 (9th Cir. 1995); *see also, United States v. Marashi,* 913 F.2d 724, 734 (9th Cir. 1990) (rejecting assertion that the government had a constitutional obligation to compile *Brady* material).

Mr. Terry's report is not the panacea defendant makes it out to be. The first question for the court is whether Ms. Stafford provided the information that defendant attributes to her. If the court closely examines the defense reports, Ms. Stafford does not say that she observed Randi Smith tell detectives about Ryan. At most, Ms. Stafford articulated a belief that, in her view, Randi Smith must have told detectives about Ryan because Ms. Smith did not know about defendant. Ms. Stafford did not confirm her knowledge and recollection that Randi Smith told police about Ryan but instead speculated on what she believed happened based on Ms. Smith's knowledge of AV1's dealers.

Ms. Stafford's statements are vague and speculative, and otherwise undermine defendant's own theory. This makes sense since the defense interviewed her two years after the initial police interview, and nothing indicated that Ms. Stafford kept a diary or used anything to refresh her memory.

Kathy Stafford never said she or Ms. Smith gave the officers license plate information. She said at the first interview she "believes" someone "provided a license plate number" but cautioned her belief was only "if she remembers correctly." She then walked that belief even further back in the second interview, clarifying that Ms. Smith had told *her* that she had the license plate but could not find it. Mr. Terry's specific goal at that interview was to confirm whether she or Ms. Smith gave the officers license plate information. Ms. Stafford gave no such

**United States' Opposition to Defendant's**  **Page 12**
**Motion to Dismiss re Discovery Claims**

confirmation. Instead, she verified that AV1 had been getting drugs "without Ms. Smith providing transportation"—thus confirming Ms. Smith wasn't in a position to see the dealer's vehicle or license plate when AV1 bought his drugs. Ms. Stafford apparently said Ms. Smith "described a vehicle" at the meeting with police, but the report documenting Ms. Stafford's statements offers no detail of what the description entailed. In any event, the type, or model, or color, or age of a car known from a past deal not close-in-time to the overdose—even if she had "described a vehicle"—is neither exculpatory nor helpful in the context of this case.

Similarly, Ms. Stafford never said Ms. Smith gave officers the name "Ryan." Again, she merely "believes" Ms. Smith provided "the name of a man named 'Ryan'," sweeping that belief under the same cautionary umbrella of "if she remembers correctly." She explained the basis for her belief in the third interview: in Ms. Stafford's view, Ms. Smith "didn't know anything about Hugo Gomez-Soto dealing to [AV1]," so, by default, Ms. Smith must have told officers about Ryan. But that just doesn't follow. And it makes sense Ms. Smith might not have known about defendant by name because defendant had relatively recently taken over the dealership role from his cousin, one of AV1's past dealers, and because Ms. Smith was not driving AV1 to buy his drugs anymore.

Lastly, Ms. Stafford's recollection of "a bundle or tinfoil of drugs" at the first interview relates to "leftover drugs they had found at the house," as she clarified in the second interview. Even if true, it has little bearing on the "container" of drugs that Ms. Smith found *on AV1's body* after he collapsed—which is what Ms. Smith gave to officers and what Det. Jones confirmed when he double-checked the evidence just weeks ago.

It is clear from Ms. Stafford's hedging, cautionary, conjecture-based language that she was doing her best to cull information about two-year-old events from the recesses of her mind

**United States' Opposition to Defendant's**            Page 13
**Motion to Dismiss re Discovery Claims**

but was unsure of their accuracy. No other evidence supports her speculation, and other evidence undermines her accuracy. For example, in her first interview, she told Mr. Terry she thought the officers were, "Travis Law and another officer, but she was not sure." Travis Law had no role in this case in January of 2024 and never spoke with Ms. Stafford. As defendant concedes, Detective Law was not assigned to defendant's case until June of 2025. ECF No. 76 at 5. And Det. Jones's supplemental report reiterates that Ms. Smith did not give the name "Ryan," confirms from his observation of the evidence in the property room that the container was in fact a "container," not tinfoil, and corroborates that no license plate was given because his search history contains no associated search.

Defendant offers no evidence to establish that Det. Jones received the alleged exculpatory or material information during his interview with Randi Smith. Mr. Terry's interviews with Ms. Stafford don't cut it. Det. Jones could not omit information he did not receive.

### C. Defendant has not made any showing of prejudice.

Early in this prosecution, the government turned over the allegedly exculpatory material regarding alternative sources in two reports. Det. Jones did not omit information from his interview report that he did not have. Defendant fails the first *Brady* hurdle. However, even if Randi Smith did provide the name of "Ryan" as an alternate source of fentanyl to Detective Jones and he intentionally omitted it, defendant cannot make the requisite showing of prejudice because that same information was in the phone records provided to defendant in November of 2024 (by the MCDA) and again in August of 2025 (by the USAO). Randi Smith said nothing about "Ryan," and even if officers had reached out to Stafford in 2024, they would have learned nothing more than what they learned from AV1's phone: that AV1 may have had at least one alternative fentanyl supplier named "Ryan."

**United States' Opposition to Defendant's**  Page 14
**Motion to Dismiss re Discovery Claims**

Where a defendant is aware of the essential facts that would enable him to take advantage of exculpatory evidence, the government's failure to disclose does not violate *Brady*. *Spriko v. Mitchell,* 368 F.3d 603, 610 (6th Cir. 2004) (collecting cases); *see also United States v. Bond,* 552 F.3d 1092, 1096 n.4 (9th Cir. 2009) (noting that a *Brady* claims fails due to a lack of suppression where the government provides the defense with the "means of obtaining exculpatory evidence"). Cumulative evidence also fails the *Brady* test. *United States v. Kohring,* 637 F.3d 895, 908 (9th Cir. 2011). The government timely provided defendant with the means of obtaining information about a possible alternative fentanyl supply source when it produced AV1's cell phone extraction report.

Even if the court accepts all of defendant's allegations as true, in addressing an untimely disclosure claim, a court considers the prosecution's reasons for its timing and "whether the defendant had an opportunity to make use of the disclosed material." *La Mere*, 827 F.2d at 625 (citing *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)); *see also United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011) ("there is no *Brady* violation so long as the exculpatory or impeaching evidence is disclosed at a time when it still has value"). Trial is still a month away, so the defense has time to pursue the alternative source theory. If it needs more time, it should ask. A continuance, rather than the harsh sanctions the defense seeks, is the "preferred" remedy. *United States v. Jumaev,* 20 F.4th 518, 547-48 (10th Cir. 2021)(internal citations omitted); *see also, United States v. Gaytan,* 115 F.3d 737, 741 (9th Cir. 1997) (holding that when a *Brady* violation can be remedied with a continuance, dismissal is improper); *United States v. Reid,* 553 F. Supp. 3d 882, 894 (WD WA 2021) (finding a continuance best remedied a late *Giglio* disclosure).

///

**United States' Opposition to Defendant's**   Page 15
**Motion to Dismiss re Discovery Claims**

In cases involving complaints of delayed disclosure—rather than full suppression of *Brady* material—due process rarely demands dismissal of charges. That is true even where material is disclosed mid-trial. *See, e.g.*, *United States v. Browne*, 829 F.2d 760, 765 (9th Cir. 1987) (police report disclosed after several witnesses had testified but defendant was able to use it for impeachment of prosecution's key witness); *see also United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993) (testifying informant's written cooperation agreement was material impeachment evidence but its late disclosure at the end of trial did not warrant reversal because the fact that the informant had an agreement with police was known).

Defendant's "tinfoil bundle" argument suffers a similar fate. He has not established its existence or that it was given to investigators. But even if it existed, and even if it was lost, defendant's claim of potential exculpatory value is speculative and he offers no evidence of bad faith or the government's knowledge of any "exculpatory value" beyond his speculation. *See Arizona v. Youngblood,* 488 U.S. 51 (1988); *California v. Trombetta,* 467 U.S. 479 (1984); *United States v. Cooper,* 983 F.2d 928, 931 (9th Cir. 1993) (citing *Youngblood, id.* at 56-57) (bad faith "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed"); *U.S. v. Sivilla,* 714 F.3d 1168, 1172 (9th Cir. 2013) (the evidence must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."). He can still pursue a "sloppy investigation" theory and has a witness to testify to her recollection of a tinfoil bundle.

**D.    An evidentiary hearing is not warranted.**

For the reasons discussed above, using the Court's supervisory powers to grant any of the requested remedies is unjustified and would be wildly disproportionate to the alleged infraction. Defendant has shown no misbehavior, certainly none that is flagrant; no prejudice, certainly none

that is substantial; and the requested remedies are unnecessarily draconian. *United States v. Bundy*, 968 F.3d 1019, 1023 (9th Cir. 2020) (cites omitted) (supervisory powers may be used to address "flagrant misbehavior" causing "substantial prejudice," "where no lesser remedial action is available."). Moreover, the evidentiary hearing request should be denied.

A district court has broad discretion in deciding whether to conduct an evidentiary hearing. *United States v. Lazarevich*, 147 F.3d 1061, 1065 (9th Cir. 1998) (affirming denial of evidentiary hearing because it would have required an excessive continuance). An evidentiary hearing is required only when resolution in accordance with the Defendant's contentions would entitle him to relief. *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980). This requires the defendant to allege facts sufficient to enable this Court to conclude that relief would be required. *Id*. at 1191; *see also United States v. Evans*, 796 F.2d 264, 266 (9th Cir. 1986) (affirming denial of motion for evidentiary hearing where, assuming the truth of the allegations, they do not meet the threshold elements of the claim). The allegations must be "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Packwood*, 848 F.2d 1009, 1010 (9th Cir. 1988). "General or conclusory factual allegations are not enough to require a hearing." *Id.*

Defendant has failed to allege sufficiently definite, detailed, and nonconjectural facts to give rise to an evidentiary hearing here.

///

///

///

V.    CONCLUSION

Defendant's motion should be denied. He has not established a *Brady* violation and dismissal is unwarranted.

Dated: March 2, 2026.                                  Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ *Scott Kerin*

SCOTT M. KERIN, OSB #965128
Assistant United States Attorney

/s/ *Nicole Bockelman*

NICOLE M. BOCKELMAN, OSB #105934
Assistant United States Attorney

/s/ *Sarah Barr*

SARAH BARR, WSBA #40758
Assistant United States Attorney